**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE PENN MUTUAL LIFE INSURANCE COMPANY, | : |
| | : |
| Plaintiff, | :    Case No. 09-CV-6129 |
| | : |
| v. | : |
| | : |
| GREATBANC TRUST COMPANY, as trustee of the NATALIE ROSENBLATT-SPITZER 2007 INSURANCE TRUST, NATATLIE ROSENBLATT-SPITZER, KEVIN BECHTEL, and STEVEN BRASNER, | :    **JURY TRIAL DEMANDED** |
| | : |
| Defendants. | : |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, The Penn Mutual Life Insurance Company ("Penn Mutual"), by and through its attorneys, Drinker Biddle & Reath LLP, hereby files this Complaint for Declaratory Judgment, and in support thereof avers as follows:

1.    This is an action for Declaratory Judgment under 28 U.S.C. § 2201. Penn Mutual seeks a declaration relative to its rights and obligations under a policy of life insurance issued on the life of Natalie Rosenblatt-Spitzer (the "Rosenblatt-Spitzer Policy"). Upon information and belief, the Rosenblatt-Spitzer Policy is void or voidable due to a lack of insurable interest at inception and/or material misrepresentations in the application for the Rosenblatt-Spitzer Policy. In the event that the Rosenblatt-Spitzer Policy is declared to be void or voidable, Penn Mutual also seeks damages as a result of the intentional misrepresentations made in connection with the Rosenblatt-Spitzer Policy.

**PARTIES**

2.      Plaintiff Penn Mutual is a citizen of Pennsylvania, being a life insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, located at 600 Dresher Road, Horsham, Pennsylvania 19044.

3.      Defendant Natalie Spitzer 2007 Insurance Trust (the "Rosenblatt-Spitzer Trust") is a citizen of Illinois, maintaining an address at 1301 West 22nd Street, Oakbrook, Illinois 60523.

4.      Defendant GreatBanc Trust Company ("GreatBanc") is a citizen of Illinois, being an entity organized and existing under the laws of Illinois, with a principal place of business at 801 Warrenville Road, Suite 800, Oak Brook, Illinois 60523.  GreatBanc is the trustee of the Rosenblatt-Spitzer Trust, which owns the Rosenblatt-Spitzer Policy.

5.      Defendant Natalie Rosenblatt-Spitzer is a citizen and resident of the State of Florida, and maintains an address at 12622 Via Lucia, Palm Beach, Florida 33436.

6.      Defendant Kevin Bechtel is a citizen and resident of the State of Florida, and maintains an address at 3982 Tampa Road, Oldsmar, Florida 34677.  Kevin Bechtel was one of the soliciting agents on the Rosenblatt-Spitzer Policy.

7.      Defendant Steven Brasner is a citizen and resident of State of Florida, and maintains an address at 3413 Dovecote Meadow Lane, Davie, Florida 33328.  Steven Brasner was one of the soliciting agents on the Rosenblatt-Spitzer Policy.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

9.      The venue for this action is properly placed in the Northern District of Illinois under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### A.      Stranger Originated Life Insurance

10.     In recent years, a secondary market has emerged in which speculative investors seek to obtain pecuniary interests in life insurance policies on individuals with whom they have no prior relationship.  Although it is sometimes permissible for an investor to obtain an interest in a legitimately procured life insurance policy, it is unlawful to procure a policy for the sole purpose of transferring it, directly or indirectly, to an investor.  Such arrangements are commonly referred to as STOLI, which stands for "stranger originated life insurance."

11.     STOLI investors do not acquire interests in life insurance policies on the lives of persons with whom the investors have a familial relationship or in whose longevity the investors possess a legally recognized interest.  Instead, these investors purchase policies that insure the lives of strangers – or, in many cases, purchase beneficial interests in insurance trusts or ownership in shell corporations that own those policies – with the expectation that the investors will profit by the death of the insureds.

12.     STOLI transactions run afoul of state insurable interest laws, which protect the integrity of life insurance by requiring that a policy owner have a legally cognizable interest in the longevity of the insured at the time the policy is issued.

13.     STOLI investors, who are the true intended owners of STOLI policies, attempt to circumvent these laws by carefully constructing their transactions to hide these impermissible investments.

14.     STOLI investors seek out the highest anticipated rates of return when choosing the life insurance policies.  This means the typical life insurance policy to which STOLI investors gravitate insures the life of an individual aged seventy or older, with a net worth in excess of $1 million.  These individuals can obtain large value policies, and are expected to have, actuarially speaking, a relatively limited lifespan.  For these and other reasons, these individuals are targeted by STOLI investors.

15.     The STOLI investors must also determine the resale value of the policy in the secondary market.  This value is based largely upon the life expectancy of the prospective insured.  The shorter the expected lifetime of the prospective insured, the more valuable the policy is to those who would gamble on his or her life.  At or around the time of the application for insurance, the prospective insured often submits to a life expectancy analysis to determine whether the policy, if issued, would be saleable in the secondary market.

16.     Once the STOLI investors locate an individual who meets their profile, and who will agree to collaborate in the STOLI arrangement, an application is submitted for one or more insurance policies.  The STOLI investors typically pay most or all of the prospective insured's costs, including premium payments.  STOLI investors also typically agree to pay the prospective insured a fee upon the issuance of the policy.

17.     In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation, or a limited partnership, will be the owner and beneficiary of the life insurance proceeds.  This permits the STOLI investors to acquire an interest in this holding entity

– and, most importantly, in the death benefit that later will be disbursed by the insurer – without disclosing the fact of the investors' ownership to the insurer.

18.     Another way the STOLI investors obtain ownership of the policy is to lend the insured the funds to pay the premium for a finite period of time, usually for the two-year contestability period.  Once this contestability period has expired, the insured can either repay the loan or assign the policy to the investors, thus completing the transaction.  The loan is structured to encourage the insured to assign the policy to the investors by, among other things, lending the funds at a high interest rate.

19.     While there are many other variations, all STOLI programs have one thing in common – their objective is to give investors who have no insurable interest in the life of the insured a stake in the life insurance policy of a complete stranger.

**B.      Procurement of the Rosenblatt-Spitzer Policy**

20.     Upon information and belief, sometime prior to June 21, 2007, Natalie Rosenblatt-Spitzer was approached by Kevin Bechtel, Steven Brasner, and/or certain STOLI promoters to participate in a STOLI scheme.  The plan called for Ms. Rosenblatt-Spitzer to apply for a life insurance policy on her own life to be issued by Penn Mutual, and to conceal from Penn Mutual the intent to sell the policy and/or an interest in the policy, to an investor in the secondary market.

21.     Upon information and belief, the plan also called for Ms. Rosenblatt-Spitzer to create a trust that would be the owner and the beneficiary of the policy.  However, neither the trust nor the policy were intended for legitimate insurance-related purposes.  To the contrary, it was intended from the outset that the policy would be transferred to an investor in the secondary market, and the use of the trust was to conceal this true purpose of the policy.

22.     In accordance with this plan, on June 21, 2007, Ms. Rosenblatt-Spitzer applied to Penn Mutual for a $5 million life insurance policy (the "Application").[1]  At the time of the Application, Ms. Rosenblatt-Spitzer was seventy-one years old.

23.     The Application indicated that the purpose of the policy was "Financial Planning[.]"

24.     The Application indicated that the intended owner of the policy was to be the Rosenblatt-Spitzer Trust, and the trustee of the Rosenblatt-Spitzer Trust was to be "Great Bank Trust Company" [sic].

25.     The Rosenblatt-Spitzer Trust was created on September 18, 2007, the same day that the Application was signed.

26.     The Application included the following two questions:

- Have you been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical or other secondary market provider?

- Have you in the past 2 years sold a policy to a Life Settlement, Viatical or other secondary market provider?

27.     These questions were intended to discern whether the Rosenblatt-Spitzer Policy was being sought for purposes of resale in the secondary market.

28.     Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc, as signatories to the Application, answered "No" to both of these questions.

---

[1]     A copy of the Application, redacted to protect the confidentiality of Ms. Rosenblatt-Spitzer, is attached to the Policy, which is attached hereto as Exhibit A.  The Application was signed by both Natalie Rosenblatt-Spitzer and GreatBanc, the trustee of the Rosenblatt-Spitzer Trust that was the intended owner of the Rosenblatt-Spitzer Policy.  (*See infra*, ¶ 24.)  Ms. Rosenblatt-Spitzer's date of birth and driver's license number were included on the Application.  That information, along with other identifying information and medical data, has been redacted to protect Ms. Rosenblatt-Spitzer's confidentiality.

29.     Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc, as signatories to the Application, answered "No" to the following question: "Will any part of the premium be paid from funds that are borrowed or otherwise financed?"

30.     The Application indicated that the Primary Source of Funds was "Proceeds from sale of stocks or bonds [and] Savings[.]"

31.     The Application indicated that Ms. Rosenblatt-Spitzer's financial needs for the policy were "Financial Planning[.]"

32.     The Application indicated Ms. Rosenblatt-Spitzer's income as $260,000 and her net worth as $6,917,000.

33.     On September 19, 2007, Kevin Bechtel and/or Steven Brasner[2] completed and signed an Agent's Underwriting Report in connection with the Application in their capacity as soliciting agents for the Rosenblatt-Spitzer Trust.  (*See* Exhibit A.)

34.     The Agent's Underwriting Report contained at least two misrepresentations regarding the occurrence of discussions regarding the sale of the Rosenblatt-Spitzer Policy in the secondary market and the source of premium funds.

35.     Question number 5 of the Agent's Underwriting Report asked if "any part of the premium for this policy [will] be paid for by funds that are borrowed or otherwise financed." Mr. Bechtel and/or Mr. Brasner answered "No" to this question.

36.     Question number 6 of the Agent's Underwriting Report asked if Mr. Bechtel and/or Mr. Brasner had "any discussion, or [had] any reason to believe that this policy may be

---

[2]     The Agent's Underwriting Report bears only one signature, which is illegible.  In the "Agent Information" section, which appears below the signature lines, Steven Brasner and Kevin Bechtel are both listed.

sold or assigned to a Life Settlement, Viatical or other secondary market provider." Mr. Bechtel and/or Mr. Brasner answered "No" to this question.

37. These questions were intended to discern whether the Rosenblatt-Spitzer Policy was being sought for purposes of resale in the secondary market.

38. Based upon the Application, the Agent's Underwriting Report, and the representations contained therein, the Application was approved for $5 million in total coverage ($2.5 million in base insurance, in addition to $2.5 million in term insurance), and the Rosenblatt-Spitzer Policy (Policy No. 8200569) was issued with a Policy Date of October 2, 2007.

39. Upon information and belief, the Application contained at least three misrepresentations:

    (a) The Application falsely stated that Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust had not been involved in any discussion about the possible sale or assignment of the Rosenblatt-Spitzer Policy to a Life Settlement, Viatical or other secondary market provider;

    (b) The Application falsely stated that the primary source of the funds would be from the sale of stocks or bonds and savings;

    (c) The Application falsely stated that the purpose of the Rosenblatt-Spitzer Policy was financial planning;

40. Upon information and belief, the Agent's Underwriting Report contained at least two misrepresentations concerning the intent to transfer the Rosenblatt-Spitzer Policy into the secondary market.

41. Upon information and belief, shortly after the issuance of the Rosenblatt-Spitzer Policy and in accordance with the preconceived plan, Ms. Rosenblatt-Spitzer took all of the steps necessary to effectuate a transfer of the Rosenblatt-Spitzer Policy, or the beneficial interest in the

Rosenblatt-Spitzer Policy, to an investor not in a relationship of affinity with Ms. Rosenblatt-Spitzer qualifying as having an insurable interest in her life.

42.     Upon information and belief, Ms. Rosenblatt-Spitzer received remuneration for his participation in the STOLI transaction.

43.     Upon information and belief, Ms. Rosenblatt-Spitzer has relinquished or agreed to relinquish any beneficial interest in the proceeds of the Rosenblatt-Spitzer Policy, as well as all interests in the Rosenblatt-Spitzer Trust.

44.     To date, Penn Mutual has received an aggregate of $240,969.22 in premium payments in connection with the Rosenblatt-Spitzer Policy.

45.     As a result of the foregoing, Penn Mutual has incurred significant expenses, costs, and damages.

46.     In accordance with applicable law, Penn Mutual will return the portion of the premiums, if any, that the Court orders Penn Mutual to return.

## COUNT I
## DECLARATORY JUDGMENT-MATERIAL MISREPRESENTATIONS
### (against all Defendants)

47.     Penn Mutual hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

48.     Upon information and belief, based on all the facts and circumstances, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc made material misrepresentations to Penn Mutual in the Application concerning the intent to transfer the Rosenblatt-Spitzer Policy into the secondary market.

49.     Upon information and belief, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc knew of the falsity of the representations concerning the intent to transfer the Rosenblatt-Spitzer Policy.

50.     Upon information and belief, based on all of the facts and circumstances, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc also made material misrepresentations to Penn Mutual in the Application concerning the source of funds for the premium payments on the Rosenblatt-Spitzer Policy.

51.     Upon information and belief, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc knew of the falsity of the representations concerning the source of funds for the premium payments.

52.     Upon information and belief, based on all of the facts and circumstances, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc also made material misrepresentations to Penn Mutual in the Application concerning the purpose of the Rosenblatt-Spitzer Policy.

53.     Upon information and belief, Ms. Rosenblatt-Spitzer and/or the Rosenblatt-Spitzer Trust and/or GreatBanc knew of the falsity of the representations concerning the purpose of the Rosenblatt-Spitzer Policy.

54.     Penn Mutual justifiably relied on these misrepresentations.  Had Penn Mutual known of the intent to transfer the Rosenblatt-Spitzer Policy into the secondary market, the true source of funds for the premium payments, and/or the true purpose of the Rosenblatt-Spitzer Policy, it would not have issued the Rosenblatt-Spitzer Policy.  Thus, the misrepresentations were material.

55.     Penn Mutual is thus entitled to a judicial declaration that, pursuant to applicable law, the Rosenblatt-Spitzer Policy is void *ab initio*, as it was issued by Penn Mutual in reliance upon material misrepresentations.

## COUNT II
## <u>DECLARATORY JUDGMENT-LACK OF INSURABLE INTEREST</u>
### (against Rosenblatt-Spitzer Trust)

56.     Penn Mutual hereby incorporates by reference each and every averment contained in the preceding paragraphs as if set forth herein at length.

57.     Upon information and belief, the Rosenblatt-Spitzer Policy was procured at the behest of, and/or under the direction of, a party or parties possessing no insurable interest as recognized under applicable law and, in any event, there was a lack of insurable interest in connection with the Rosenblatt-Spitzer Policy.

58.     Upon information and belief, the Rosenblatt-Spitzer Policy was issued to, at the behest of, and/or in accordance with a plan initiated by a party or parties possessing no insurable interest in the life of Ms. Rosenblatt-Spitzer.

59.     Upon information and belief, the purpose of transaction was to gamble upon the life of Ms. Rosenblatt-Spitzer.

60.     Under applicable law, Penn Mutual is entitled to a judicial declaration that the Rosenblatt-Spitzer Policy lacked an insurable interest at inception and is therefore void *ab initio*.

## COUNT III
## <u>MATERIAL MISREPRESENTATIONS</u>
### (against all Defendants)

61.     Penn Mutual hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

62.     Upon information and belief, Kevin Bechtel and/or Steven Brasner, acting on behalf of the Rosenblatt-Spitzer Trust, made material misrepresentations to Penn Mutual in the Agent's Underwriting Report concerning the intent to transfer the Rosenblatt-Spitzer Policy into the secondary market.

63.    Upon information and belief, Kevin Bechtel and/or Steven Brasner, acting on behalf of the Rosenblatt-Spitzer Trust, knew of the falsity of the representations concerning the intent to transfer the Rosenblatt-Spitzer Policy or made such misrepresentations in reckless disregard of the truth.  Thus, these misrepresentations were intentional.

64.    Upon information and belief, Kevin Bechtel and/or Steven Brasner, acting on behalf of the Rosenblatt-Spitzer Trust, made representations concerning the intent to transfer the Rosenblatt-Spitzer Policy for the purpose of defrauding Penn Mutual.

65.    Penn Mutual had a right to rely on these misrepresentations and did justifiably rely on them.  Had Penn Mutual known of the intent to transfer the Rosenblatt-Spitzer Policy into the secondary market, it would not have issued the Rosenblatt-Spitzer Policy.  Thus, the misrepresentations were material.

66.    Penn Mutual has incurred substantial damages as a direct result of Defendants' wrongful conduct, including, among other things, costs and expenses associated with the issuance of the Rosenblatt-Spitzer Policy.

## RELIEF REQUESTED

WHEREFORE, Penn Mutual respectfully requests the entry of an Order by this Court as follows:

A.    Declaring whether the Rosenblatt-Spitzer Policy is void or voidable due to material misrepresentations in the Application;

B.    Declaring whether the Rosenblatt-Spitzer Policy is void or voidable due to a lack of insurable interest at the inception of the Rosenblatt-Spitzer Policy;

C.    In the event that the Court declares the Rosenblatt-Spitzer Policy void or voidable, declaring whether Penn Mutual may retain some or all of the premiums paid on the Rosenblatt-Spitzer Policy;

D. In the event that the Court declares the Rosenblatt-Spitzer Policy void or voidable, awarding Penn Mutual damages in the amount of its costs, expenses and commission as a result of the intentional misrepresentations;

E. Awarding Penn Mutual attorneys' fees and costs, as determined by the Court; and

F. Awarding such further relief as this Court deems appropriate.

Dated: October 1, 2009

Respectfully submitted,

THE PENN MUTUAL LIFE INSURANCE COMPANY

 /s/ David S. Almeida
One of Its Attorneys

David S. Almeida (I.D. 06285557)
**DRINKER BIDDLE & REATH LLP**
191 N. Wacker Drive, Suite 3700
Chicago, IL 60606-1698
(312) 569-1426 – Telephone
(312) 569-3426 – Facsimile
David.Almeida@dbr.com

*Of Counsel:*

Stephen C. Baker (*pro hac vice* application to be filed)
Katherine L. Villanueva (*pro hac vice* application to be filed)
**DRINKER BIDDLE & REATH LLP**
One Logan Square
Philadelphia, PA 19103
(215) 988-2535 – Telephone
(215) 988-2757 – Facsimile

*Attorneys for The Penn Mutual Life Insurance Company*

PHLIT/ 1190410.2

- 13 -